BOSTON HOUSING AUTHORITY *vs.* RUTH HEMINGWAY
(and a companion case).

Suffolk.   November 8, 1972. — March 5, 1973.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, HENNESSEY, & WILKINS, JJ.

*Landlord and Tenant*, Habitability, Lease as contract, Dependence of obligations, Rent, State Sanitary Code, Recovery of possession. *Public Health. Housing.*

In an action of summary process by a landlord against a tenant for failure to pay rent, where the tenant failed to give notice to the landlord that rent would be withheld because there were violations of the State Sanitary Code which rendered the leased premises uninhabitable, the tenant was foreclosed from asserting a defence under G. L. c. 239, § 8A, as appearing in St. 1967, c. 420, § 1, even though the landlord had been issued a report by the city housing inspection department that such violations existed.   [186–187]

Discussion of the nature of a letting of property and the parties' obligations to each other at common law and a review of the authorities pertaining thereto.   [188–191]

Discussion of modern legislation and regulations thereunder in the landlord-tenant area.   [191–196]

The enactment of G. L. c. 239, § 8A, which provides tenants with a defence to actions by landlords for failure to pay rent where rent is withheld because of violations of the State Sanitary Code, does not preclude the courts from creating new common law rights and remedies.   [196, n. 10]

The old common law rule that a lease was a conveyance of an estate in real property for a term and the old independent covenants rule have outlived their usefulness; the modern view of the law of landlord and tenant favors an approach which recognizes a lease as essentially a contract between a landlord and a tenant in which the landlord promises to deliver and maintain the demised premises in a habitable condition and the tenant promises to pay rent for such habitable premises, and their promises are interdependent.   [196–199]

Under a rental of premises for dwelling purposes, by a written or oral lease, for a specified time or at will, there is an implied warranty by the landlord that the premises are fit for human occupation and will remain so [199]; QUIRICO, REARDON and WILKINS, JJ., were of opinion that the warranty "fit for human occupation" was too broad and insufficiently defined, and that the landlord's obligation should be related to the statutes and other provisions having the force of law which prescribe minimum standards for dwellings [213–220].

Statement of remedies of a tenant of a dwelling for breach by the landlord of his implied warranty of habitability of the dwelling. [199–202]

If a tenant of a dwelling unit refused to pay his rent because of breach by the landlord of his implied warranty of habitability, but failed to comply with the notice requirement in G. L. c. 239, § 8A, as appearing in St. 1967, c. 420, § 1, he would have no defence against eviction, but the landlord's breach of warranty could be raised as a defence to the landlord's claim for rent owed during the time when the demised premises were in an uninhabitable condition, and the tenant's claim or counterclaim for damages based on the breach would be the difference between the value of the dwelling as warranted and its value as it existed in its defective condition. [202–203]

TWO ACTIONS OF SUMMARY PROCESS.   Writs in the Municipal Court of the Roxbury District dated October 30, 1969.

Upon appeal to the Superior Court the actions were heard by *Kalus*, J.

*Joseph S. Murphy, Jr.*, for the defendants.

*George F. Mahoney* for the plaintiff.

TAURO, C.J.   The Boston Housing Authority (landlord) brought two actions of summary process against the defendants (tenants)[1] for failure to pay rent.   The tenants contend that they were entitled to withhold rent under G. L. c. 239, § 8A, because their apartments were in uninhabitable condition[2] in violation of the State Sanitary Code.   The tenants argue in the alternative that the landlord's breach of an implied warranty that the demised premises were suitable for human occupation extinguished the tenants' rental obligations.   The

---

[1] The defendant tenants are Ruth Hemingway and Ruth Briggs.

[2] The tenants claimed that their apartments had, among other defects, leaking ceilings, wet walls, improper heating, and broken doors and windows, and were infested with rodents and vermin.

cases were originally entered and tried in the Municipal Court of the Roxbury District where the judge found for the landlord against the tenants. The tenants appealed to the Superior Court under G. L. c. 239, § 5, as amended through St. 1969, c. 366, where the cases were retried. The trial judge found as to each tenant that the landlord was entitled to possession and rent of $1,200 up to and including June 30, 1970.[3] The cases come before us on a consolidated bill of exceptions.

The evidence is summarized. After making repeated demands to the landlord that repairs be made to remedy the defects which rendered their apartments uninhabitable, the tenants began withholding rent on March 1, 1969. They took this action after the Boston housing inspection department had issued a report to the landlord which certified that serious housing code violations existed which "may endanger or materially impair the health or safety, and the well-being of any tenant therein or persons occupying said property." Although G. L. c. 239, § 8A,[4] permits a tenant to withhold rent in such situations, it required the tenant to give written notice to his landlord of his intention to do so. The record supports

---

[3] Since Ruth Briggs vacated her apartment on September 30, 1970, her exceptions in essence are based on the finding by the trial judge for the landlord for $1,200.

[4] General Laws c. 239, § 8A, as appearing in St. 1967, c. 420, § 1, states in pertinent part: "There shall be no recovery under this chapter, pursuant to a notice to quit for nonpayment of rent . . . of any tenement rented or leased for dwelling purposes if such premises are in violation of the standards of fitness for human habitation established under the state sanitary code . . . and if such violation may endanger or materially impair the health or safety of persons occupying the premises; provided, however (1) that the person occupying the premises, while not in arrears in his rent, gave notice in writing to the person to whom he customarily paid his rent (a) that he would, because of such violation, withhold all rent thereafter becoming due until the conditions constituting such violations were remedied and (b) that a report of an inspection of such premises has been issued by the board of health . . . which report states that such violation exists and that it may endanger or materially impair the health or safety of persons occupying said premises; (2) that such violation was not caused by the person occupying the premises . . . ; (3) that the premises are not situated in a hotel or motel; nor in a lodging house or rooming house wherein the person occupying the dwelling unit has maintained said occupancy for less than three consecutive months; and (4) that the conditions constituting the violation can be remedied without the premises being vacated. . . ."

the Superior Court judge's finding that the tenants failed to comply with this provision of the statute and thus were foreclosed from asserting G. L. c. 239, § 8A, as a defence to the Boston Housing Authority's action.[5]

However, at the close of the evidence, the tenants presented requests for findings of fact and rulings of law. Among the requests were the following: "8. That the obligations of the Housing Authority to supply and maintain premises in compliance with the Housing Regulations and the obligations of the tenant to pay rent under a rental agreement are dependent." "15. That any money owed by the Defendants to the Plaintiff ought to be determined by this Court according to the degree of inhabitability of each apartment of Defendants." "21. That even if the Defendants had not complied with Chapter 239 (8) (A) of the Withholding Statute the defense of uninhabitability would still exist if the premises were as a matter of fact found to be in violation of the State Sanitary Code." The Superior Court judge held that he need not reach these requests for rulings because of the tenants' failure to comply with the notice requirement of c. 239, § 8A. The denial of these requests presents the central issue in these cases, namely, whether the tenants' remedies are limited to the pertinent statutory provisions.

Implicit in the trial judge's decision was the assumption that the tenants had no common law defence. The trial judge correctly applied the common law as it has existed in the Commonwealth for many years in refusing to permit the tenants to raise the landlord's alleged breach of an implied warranty of habitability as a defence to the landlord's summary process action. "There

---

[5] In 1969, the Legislature amended § 8A to allow written notification of Code violations to the landlord from the appropriate local agency (such as the Boston housing inspection department) to satisfy the tenant's obligation to notify the landlord. Since they began withholding rent after the landlord had received notice of the Code violations, the tenants in the instant cases could have properly raised c. 239, § 8A, as a defence if the amendment applied to them. However, the amendment was enacted after the tenants had started to withhold rent and therefore did not apply to them. See St. 1969, c. 355, approved May 27, 1969, effective ninety days thereafter.

is no implied agreement, apart from fraud, that the demised premises are or will continue to be fit for occupancy or safe and in good repair. The tenant takes the premises as he finds them and there is no obligation on the landlord to make repairs." *Fiorntino* v. *Mason*, 233 Mass. 451, 452. Although the *Fiorntino* case involved a tenancy at will, the language applies equally to a tenancy under a lease, absent any express provisions to the contrary. Since the leases between the landlord and the tenants in the present cases do not contain any express covenant to deliver or maintain the apartments in habitable condition, the tenants do not have any common law defence to the landlord's action of summary process unless we change the old common law independent covenants rule as the tenants urge us to do. The tenants' challenge to our common law rule of independent covenants has led us to reconsider whether the historical source and justifications for the rule are still valid in the modern context.

1. The Boston Housing Authority relies on a series of Massachusetts cases which established and followed the doctrine of caveat emptor and independent covenants between the landlord and the tenant. Mr. Justice Gray stated the old common law rule in *Royce* v. *Guggenheim*, 106 Mass. 201, 202–203: "It is now well settled, both here and in England, that in a lease of a building for a dwelling-house or store no covenant is implied that it should be fit for occupation. [Citations omitted.] And the English authorities, ancient and modern, are conclusive, that even where the landlord is bound by custom or express covenant to repair, and by his failure to do so the premises become uninhabitable, or unfit for the purpose for which they were leased, the tenant has no right to quit the premises, or to refuse to pay rent according to his covenant, but his only remedy is by action for damages." See, e.g., *Kramer* v. *Cook*, 7 Gray 550; *Leavitt* v. *Fletcher*, 10 Allen 119; *Ware* v. *Hobbs*, 222 Mass. 327; *Stone* v. *Sullivan*, 300 Mass. 450.

These cases were predicated on the old common law

assumption that a lease was in fact a conveyance of an estate in real property for a term. This characterization of the lease as a transfer of a property interest governed by property law reflected the parties' expectations in a rural agrarian society where the right to possession of the *land* constituted the chief element of the exchange. "The common law focused on possession rather than service. The ideal landlord delivered possession, then did nothing more; the ideal tenant paid his rent and demanded nothing more than possession." Notes, 56 Cornell L. Rev. 489, 490.

Thus, originally at common law, the tenant could not even escape his rental obligation when the demised premises were destroyed because of the law's view that the land and not the premises was the essential part of the transaction. See *Paradine* v. *Jane*, 82 Eng. Rep. R. 897; Am. Law of Property, § 3.103. Even if the landlord made express maintenance promises in the lease, courts often held that the landlord's breach of these "secondary" obligations did not affect the tenant's obligation to pay rent. See *Stone* v. *Sullivan*, 300 Mass. 450. The tenant was released from his covenant to pay rent only when the landlord repossessed the property or interfered with the tenant's quiet enjoyment of his leasehold. See *Royce* v. *Guggenheim*, 106 Mass. 201 (1870).

Given the rural agrarian context in which these rules were judicially formulated, the independent covenants rule made sense. However, the rule's strict application often produced harsh results in those cases where the tenant was more interested in the demised building than the land on which it was situated. The chief judicial response to this problem was the development of the "constructive eviction" doctrine "which relieved the tenant of his rent obligation if he could show that he had vacated the leased premises due to a severe failure of maintenance services amounting to a breach of the landlord's duty to assure quiet possession." Notes, 56 Cornell L. Rev. 489, 491. See *Nesson* v. *Adams*, 212 Mass. 429 (1912). This rule allowed the court to mitigate some

of the injustices stemming from strict application of the independent covenants rule without repudiating the rule's basic premise that the lease was essentially a conveyance of a possessory interest in land for a term and not a contract for a dwelling suitable for human occupation. The constructive eviction doctrine created the legal fiction that the tenant had been "evicted" to show that the tenant's possessory interest in the property itself was destroyed by the landlord's failure to provide adequate maintenance services. It was the loss of the tenant's possessory interest which excused him from paying rent.

The constructive eviction defence gave the tenant the option of abandoning the demised premises in order to extinguish his rental obligation if the court shared the tenant's view as to what acts or omissions on the landlord's part constituted a breach of his duty to assure quiet possession. However, this defence offered little solace to the tenant who was more interested in securing a livable dwelling than a plot of land. Once again, this court responded by creating another exception to the independent covenants rule in those cases where the circumstances made it clear that the tenant's purpose in signing the lease was to secure a dwelling fit for human occupation.

With rare foresight, this court in *Ingalls* v. *Hobbs*, 156 Mass. 348, 350, held that the independent covenants rule did not apply to a leasing of a furnished house or room for a short term. "But there are good reasons why a different rule should apply to one who hires a furnished room or a furnished house for a few days or a few weeks or months. Its fitness for immediate use of a particular kind, as indicated by its appointments, is a far more important element entering into the contract than when there is a mere lease of real estate. One who lets for a short term a house provided with all furnishings and appointments for immediate residence may be supposed to contract in reference to a well understood purpose of the hirer to use it as a habitation. . . . It would be unreasonable to hold, under such circumstances, that the landlord does not impliedly agree that what he is letting

is a house suitable for occupation in its condition at the time." Although the court's holding in the *Ingalls* case has been limited to its special facts of a short term lease for a furnished room or dwelling, its rationale rested on the broader premise that we would not apply the independent covenants rule in those cases where the essential purpose of the lease was not the transfer of an interest in land but the use of the demised premises for immediate occupation. In effect, the *Ingalls* case reflected this court's willingness to imply a warranty of habitability when it was clear that the lease was essentially a contract in which the landlord promised to deliver premises suitable to the tenant's purpose in return for the tenant's promise to pay rent.

This judicial willingness to expand the number of exceptions to the independent covenants rule in appropriate cases by treating the lease more as a contract than as a property conveyance was supported by our decision in *Charles E. Burt, Inc.* v. *Seven Grand Corp.* 340 Mass. 124. We held in the *Burt* case that the tenant may get damages in a suit for equitable relief *despite its failure to abandon the premises.* We noted that damages without abandonment are possible in those cases where the breach of the covenant of quiet enjoyment "goes to the essence" of the contract. P. 129. We decided that the tenant was entitled to damages in the *Burt* case because "[s]uch relief is more nearly adequate than the incomplete and hazardous remedy at law which requires that the lessee (a) determine at its peril that the circumstances amount to a constructive eviction, and (b) vacate the demised premises, possibly at some expense, while remaining subject to the risk that a court may decide that the lessor's breaches do not go to the essence of the lessor's obligation." The *Burt* case, *supra,* 129–130.

The gradual judicial erosion of the independent covenants rule has been accelerated by the Massachusetts Legislature's initial reforms in the landlord-tenant area. In 1960, the Massachusetts Department of Public Health,

pursuant to the authority granted by G. L. c. 111, § 5, adopted art. II of the State Sanitary Code which established minimum standards of fitness for human habitation for all housing in the Commonwealth. However, this initial legislative and administrative response to the growing housing crisis had little effect because the public agencies, which were totally responsible for the enforcement of the State Sanitary and Housing codes, lacked the resources necessary to police the entire housing sector. See 52 Mass. L. Q. 205. Since the efforts of these agencies to enforce Code regulations had proved ineffective, the Legislature enacted new legislation in 1965 to help promote effective enforcement of Code regulations and thereby insure that all housing would meet the minimal standards of habitability defined by art. II of the State Sanitary Code.[6]

The common purpose underlying these new statutes was to create a private remedy for these public violations by giving the tenant the power to initiate the Code enforcement process. (See 52 Mass. L. Q. 205.) General Laws c. 111, §§ 127C–127F and 127H, allow the tenant himself to initiate the process by a petition to either a District Court (§ 127C) or the Superior Court (§ 127H) requesting a finding that Code violations exist which "may endanger or materially impair the health or well-being of any tenant." If the court makes this finding and concludes that "such rental payments are necessary to remedy the condition constituting the violation," the court may by written order "authorize the petitioner . . . to make rental payments . . . to the clerk of the court" (§ 127F). The court can then order the clerk to "disburse all or any portion of the rental payments received by him to the respondent [lessor] for the purpose of effectuating the removal of the violation" (§ 127F).

[6] Article II of the State Sanitary Code was originally adopted by the Department of Public Health on September 13, 1960, in the exercise of authority granted by G. L. c. 111, § 5. By St. 1965, c. 898, §§ 1, 3, that authority was eliminated from § 5 and placed instead in a new § 127A inserted in c. 111. Section 127A was amended by St. 1971, c. 261.

Once the defects are corrected, the remaining balance of any rent paid to the court will be given back to the landlord (§ 127F).

The purpose of these statutes was to allow tenants to initiate the Code enforcement process by bringing before the courts recalcitrant landlords who refused to remedy conditions in the tenants' dwelling units which violate the State Sanitary Code. However, many tenants, especially poor tenants, would not avail themselves of a remedy which required them to sue their landlords. Therefore, the Legislature has also granted tenants a defensive remedy by enacting c. 239, § 8A.[7] It authorizes tenants to withhold rent where a housing code inspection report citing sanitary code violations has been issued to the landlord. The tenant can take this action without having to sue the landlord and without fear of being evicted for nonpayment of rent. Chapter 239, § 8A, amended summary process so that the landlord's violation of State Sanitary Code standards of fitness for human habitation, if properly raised, would constitute a defence for the tenant in that proceeding. This statute allows the tenant to initiate the Code enforcement process by direct action against his landlord without using the court as an intermediary. Unlike the more cumbersome procedure established in c. 111, §§ 127A–127H, where the landlord can use delaying tactics by asking for repeated continuances, c. 239, § 8A's provisions force him to take the initiative by making repairs or contesting the tenant's action in court in order to recover the withheld rent.[8]

Thus, G. L. c. 239, § 8A, grants the tenant the right to withhold rent in order to aid effective enforcement of State Sanitary Code regulations. The statute's authori-

---

[7] Both G. L. c. 111, §§ 127C–127F and 127H, and G. L. c. 239, § 8A, were approved on the same day, January 7, 1966.

[8] General Laws c. 111, §§ 127A–127H, expressly provides that any balance of rental payments remaining after the costs of repairs have been deducted is returned to the lessor. Though there is no comparable provision in c. 239, § 8A, we noted in *Appelstein* v. *Quinn,* 361 Mass. 861, that c. 239, § 8A, "does not permanently deprive a landlord of the rent but only permits the tenant to withhold it until the stated violations are corrected."

zation of rent withholding "was to provide a tenant with yet another means of enforcing the state sanitary code or local health regulations, but without the necessity for a timid tenant to initiate court proceedings in what may appear to be a 'frightening' system." 52 Mass. L. Q. 205, 228. This purpose is made clear by the fact that once repairs are made, the landlord receives the balance of any remaining rent held in escrow. *Appelstein* v. *Quinn*, 361 Mass. 861. The statute's clear purpose is to promote repairs by giving the landlord the incentive of getting his rent if he complies with the Code regulations.

At common law, the tenant could never justifiably withhold rent until the landlord made repairs because his rental obligation was not dependent on any services performed by the landlord besides delivery of the property to the tenant. However, both the courts in rendering decisions such as those in the *Ingalls* case, 156 Mass. 348, and the *Burt* case, 340 Mass. 124, *supra*, and the Legislature in enacting the rent withholding provisions, have retreated from the fundamental common law assumption on which the independent covenants rule is based, namely, that a lease is primarily a conveyance of an interest in real estate. By fixing a clear duty of repair on the landlord before the landlord can recover withheld rent in those cases where the demised premises are in violation of the standards of fitness for human habitation established under the State Sanitary Code, the Massachusetts Legislature has further weakened [9] the old common law rule that the tenant's obligation to pay rent is totally independent of any obligation the landlord may bear.

---

[9] However, c. 239, § 8A, and c. 111, §§ 127A–127H, have not abrogated the independent covenants rule. See *Rubin* v. *Prescott*, 362 Mass. 281, 286, fn. 4, where we noted that the State Sanitary Code did not abrogate the lessor's common law rights to recover possession when the premises did not comply with the minimum standards of the Code for dwelling purposes. If the Sanitary Code did not abrogate the common law rule of independent covenants, it seems logical to conclude that remedial legislation designed to aid enforcement of the Code has not repealed the common law rule. For similar treatment of a New York rent withholding statute's impact on landlord-tenant common law, see *Davar Holdings, Inc.* v. *Cohen*, 255 App. Div. (N. Y.)

Thus, we are confronted with a situation where the legislation's "establishment of policy carries significance beyond the particular scope of each of the statutes involved." *Moragne* v. *States Marine Lines, Inc.* 398 U. S. 375, 390. As Professor James Landis noted in his essay, Statutes and the Sources of Law, Harvard Legal Essays (1934), pp. 222–223, "Doctrines of common law dealing with the relationship betwen individuals will often be seen to hinge upon a conception as to the position that one party is to occupy in our social structure. This becomes solidified into a concept of status. But obviously status has no meaning apart from its incidents. These incidents, often so numerous as to escape description, have a varying importance in shaping the nucleus of a status. The alteration of some of them possesses no importance beyond the change itself; the alteration of others, however, may call for a radical revision of the privileges or disabilities that have generally been attached to a particular status. The common-law incidents of status, that in their origin have themselves been of empiric growth, must then give way before the new aims deducible from such a basic alteration.

"Changes of this nature are commonly the product of legislation. The statutes that express them rarely directly make or alter a status as such; nor do the statutes often see the seamlessness of the pattern that they seek to change. The task of modifying the existing body of the law to fit the structural changes must of necessity be left to courts with the hope that given an end they will mould substantive doctrine to make it effective."

The independent covenants rule was the most important logical incident flowing from the common law's conception of the lease as a conveyance of an interest in real estate. Although c. 239, § 8A, did not abrogate

445, affd. 280 N. Y. 828; *Matter of Himmel* v. *Chase Manhattan Bank,* 47 Misc. 2d (N. Y.) 93, 96; *Matter of De Koven* v. *780 West End Realty Co.* 48 Misc. 2d (N. Y.) 951; *176 East 123rd St. Corp.* v. *Flores,* 65 Misc. 2d (N. Y.) 130.

the independent covenants rule, it drastically altered most of the logical incidents flowing from the lease's old status as property conveyance by allowing rent withholding, a remedy which reflects the Legislature's judgment that the tenant should be paying rent only for habitable premises. This legislative alteration of the most important incident of the common law status of a lease as a property conveyance requires a judicial reappraisal[10] of the common law status itself because the Legislature's actions reflect a characterization of the landlord-tenant relationship that radically differs from the status accorded to it by the common law.

Our reëxamination leads us to conclude that the exception to the independent covenants rule carved out by the *Ingalls* case, 156 Mass. 348, *supra*, in response to what was then an unusual situation, must now become the rule in an urban industrial society where the essen-

---

[10] The Boston Housing Authority argues that even if there is an implied warranty of habitability, c. 239, § 8A, offers tenants the exclusive remedy for its breach. However, there is no evidence to indicate that the Legislature intended the limited remedy afforded by c. 239, § 8A, to exclude appropriate additional remedies created by changes in the common law.

This conclusion is supported by recent judicial decisions to reform the landlord-tenant common law rules in States which have rent withholding statutes. All of these decisions are predicated on the implied assumption that remedial legislation designed to promote safe and sanitary housing does not preclude the courts from fashioning new common law rights and remedies to facilitate the policy of safe and sanitary housing embodied in the withholding statutes. See *Hinson* v. *Delis*, 26 Cal. App. 3d 62; *Amanuensis Ltd.* v. *Brown*, 65 Misc. 2d (N.Y.) 15; *Jackson* v. *Rivera*, 65 Misc. 2d (N. Y.) 468; *Morbeth Realty Corp.* v. *Rosenshine*, 67 Misc. 2d (N. Y.) 325. In *Jack Spring, Inc.* v. *Little*, 50 Ill. 2d 351, the Illinois Supreme Court expressly rejected the landlord's claim that the tenant's request for far reaching changes in landlord-tenant law "is appropriate for legislative rather than judicial consideration." P. 357. Despite the Legislature's passage of a rent withholding statute, Ill. Rev. Sts. c. 23, § 11-23, that court noted that there was no need to defer to future legislative reforms of old common law rules in the landlord-tenant area. "A rule which in its origin was the creation of the courts themselves, and was supposed in the making to express the *mores* of the day, may be abrogated by courts when the *mores* have so changed that perpetuation of the rule would do violence to the social conscience. . . . This is not usurpation. It is not even innovation. It is the reservation for ourselves of the same power of creation that built up the common law through its exercise by the judges of the past." Justice Cardozo, The Growth of the Law, c. IV, p. 136, cited at p. 367 of the *Jack Spring* case.

tial objective of the leasing transaction is to provide a dwelling suitable for habitation. The old common law treatment of the lease as a property conveyance and the independent covenants rule which stems from this treatment have outlived their usefulness. The urban tenant in a multiple dwelling unit cares little about the property interest he has acquired. Modern tenants, rightfully expect that the premises they rent, whether furnished or unfurnished, will be suitable for occupation. In *Javins* v. *First Natl. Realty Corp.* 428 F. 2d 1071 (D. C. Cir. 1970), the court justified in part its decision that all leases for dwellings imply a warranty of habitability [11] by demonstrating how the factual assumptions underlying the *Ingalls* case exception to the independent covenants rule were in closer harmony to modern housing patterns than the old common law assumption that a property conveyance was the essential objective of the transaction.

"It is overdue for courts to admit that these assumptions are no longer true with regard to all urban housing. Today's urban tenants, the vast majority of whom live in multiple dwelling houses, are interested, not in the land, but solely in 'a house suitable for occupation.' Furthermore, today's city dweller usually has a single, specialized skill unrelated to maintenance work; he is unable to make repairs like the 'jack-of-all-trades' farmer who was the common law's model of the lessee. Further, unlike his agrarian predecessor who often re-

---

[11] We face a slightly different situation from that which confronted the court in the *Javins* case, *supra*. At the time of the *Javins* decision, the Washington, D. C., Code did not contain any rent withholding provisions which the tenants could implement when their apartments were in uninhabitable condition. The Code merely provided for criminal sanctions by public agencies when landlords maintained their apartments in violation of the Code. Thus, the *Javins* case holding, which granted tenants private rent withholding powers and contractual remedies which could abate or extinguish their rental obligations, constituted a judicial reform of landlord-tenant common law which radically expanded the scope of remedies previously available to the tenant under the housing codes. Since the Massachusetts Legislature has already passed a rent withholding statute, a decision to grant alternative rent abatement or suspension remedies would constitute a far less radical alteration of existing tenant remedies than that accomplished by the *Javins* decision.

mained on one piece of land for his entire life, urban tenants today are more mobile than ever before.   A tenant's tenure in a specific apartment will often not be sufficient to justify efforts at repairs.   In addition, the increasing complexity of today's dwellings renders them much more difficult to repair than the structures of earlier times.   In a multiple dwelling repair may require access to equipment and areas in the control of the landlord.   Low and middle income tenants, even if they were interested in making repairs, would be unable to obtain any financing for major repairs since they have no long-term interest in the property." *Javins* v. *First Natl. Realty Corp.* at 1078–1079.

The opinion in the *Javins* case reflects the view expressed in recent cases and law review articles [12] which rejects the old common law's conception of the lease as a property transaction.   The modern view favors a new approach which recognizes that a lease is essentially a contract between the landlord and the tenant wherein the landlord promises to deliver and maintain the demised premises in habitable condition and the tenant promises to pay rent for such habitable premises.   These promises constitute interdependent and mutual considerations.   Thus, the tenant's obligation to pay rent is predicated on the landlord's obligation to deliver and maintain the premises in habitable condition.

This modern view that the common law should imply warranties of habitability in all leases is supported by the Massachusetts Legislature's reforms in the landlord-tenant area which reflect the Legislature's view that rent is paid for habitable premises and not for an

---

[12] See *Javins* v. *First Natl. Realty Corp.* 428 F. 2d 1071 (D. C. Cir.) ; *Hinson* v. *Delis*, 26 Cal. App. 3d 62; *Lemle* v. *Breeden*, 51 Hawaii 426; *Jack Spring, Inc.* v. *Little*, 50 Ill. 2d 351; *Kline* v. *Burns*, 111 N. H. 87; *Marini* v. *Ireland*, 56 N. J. 130; *Morbeth Realty Corp.* v. *Rosenshine*, 67 Misc. 2d (N. Y.) 325; *Pines* v. *Perssion*, 14 Wis. 2d 590; Notes, 40 Fordham L. Rev. 123; Notes, 56 Cornell L. Rev. 489; Recent Developments, (1970) Duke L.J. 1040.; Notes, 21 Drake L, Rev. 300; 52 Mass. L. Q. 205.   See also American Bar Foundation Tent. Draft – Model Residential Landlord-Tenant Code (1969) ; Uniform Residential Landlord-Tenant Act, §§ 2.103, 2.104 (1972).

interest in real estate. General Laws c. 111, §§ 127A–127F and 127H, and G. L. c. 239, § 8A, have already encroached to some degree on the common law rules of caveat emptor and independent covenants. If we fail to repudiate the underlying common law concept of a lease which fostered the independent covenants rule, the landlord-tenant law in Massachusetts will remain in an illogical state because our statutory and common law will be based on differing conceptual assumptions as to the essential nature and consequences of a lease. As the Wisconsin Supreme Court noted in *Pines* v. *Perssion,* 14 Wis. 2d 590, 595–596: "[T]he legislature has made a policy judgment — that it is socially (and politically) desirable to impose these duties on a property owner — which has rendered the old common-law rule obsolete. To follow the old rule of no implied warranty of habitability in leases would, in our opinion, be inconsistent with the current legislative policy concerning housing standards."

Therefore, we hold that in a rental of any premises for dwelling purposes, under a written or oral lease, for a specified time or at will, there is an implied warranty that the premises are fit for human occupation. "This means that at the inception of the rental there are no latent [or patent] defects in facilities vital to the use of the premises for residential purposes and that these essential facilities will remain during the entire term in a condition which makes the property livable." *Kline* v. *Burns,* 111 N. H. 87, 92. This warranty (in so far as it is based on the State Sanitary Code and local health regulations) cannot be waived by any provision in the lease or rental agreement.

## REMEDIES FOR THE LANDLORD'S BREACH OF THE IMPLIED WARRANTY OF HABITABILITY.

2. Since we hold that the tenant's covenant to pay rent is dependent on the landlord's implied warranty of habitability, there is no need for a constructive eviction

defence to justify the tenant's decision to stop paying
rent. "The doctrine of constructive eviction as an ad-
mitted judicial fiction, . . . no longer serves its purpose
when the more flexible concept of implied warranty of
habitability is legally available." *Lemle* v. *Breeden,* 51
Hawaii 426, 434.

Thus, instead of pleading constructive eviction as a
defence to the landlord's action to recover rent, the
tenant has recourse to the following contractual rights
and remedies[13] afforded by the warranty of habitabil-
ity:[14]

(1) The tenant can sue the landlord and ask for re-
scission of his written lease from the point in time that
the breach of the implied warranty of habitability
first arose. The existence of a material breach will be a
question of fact to be determined in the circumstances of
each case.[15] Factors (not necessarily all inclusive) aid-
ing the court's determination of the materiality of an
alleged breach of the implied warranty of habitability in-
clude: (a) the seriousness of the claimed defects and
their effect on the dwelling's habitability;[16] (b) the

[13] Since these cases did not raise any question of tort liability, we
need not consider the effect this continuing warranty of habitability
may have on the landlord's liability for injuries to the tenant or his
guests which result from conditions rendering the apartment uninhab-
itable.

[14] By discussing the outline of remedies now available to a tenant,
we do not purport to forecast all the changes that will arise from
our new common law rule.

[15] A *housing inspection report which certifies* that Code violations
exist which "may endanger or materially impair the health or safety,
and the well-being of any tenant therein or persons occupying said
property" would constitute evidence of a material breach and the
landlord's notice of that breach.

[16] The State Sanitary Code's minimum standards of fitness for human
habitation and any relevant local health regulations provide the trial
court with the *threshhold* requirements that all housing must meet.
Proof of any violation of these regulations would usually constitute
compelling evidence that the apartment was not in habitable condi-
tion, regardless of whether the evidence was sufficient proof of a con-
structive eviction under our old case law. However, the protection
afforded by the implied warranty of habitability does not necessarily
coincide with the Code's requirements. There may be instances where
conditions not covered by the Code regulations render the apartment
uninhabitable. Although we have eliminated the defence of con-
structive eviction in favor of a warranty of habitability defence, a fact

length of time the defects persist; (c) whether the land-lord or his agent received written or oral notice of the defects;[17] (d) the possibility that the residence could be made habitable within a reasonable time;[18] and (e) whether the defects resulted from abnormal conduct or use by the tenant. If the court found a material breach of warranty, the tenant would be permitted to terminate the lease and recover any security deposits made; although he will be liable for the reasonable value, if any, of his use of the premises for the time he was in posses-sion. See *Lemle* v. *Breeden,* 51 Hawaii 426; *Pines* v. *Perssion* 14 Wis. 2d 590, 597.

(2) If the tenant wishes to keep his lease and continue to occupy the premises, he can initiate proceedings under c. 111, §§ 127A–127H, or withhold rent pursuant to the procedures established by c. 239, § 8A. If the landlord remedies the defects, he will recover the with-held rent. This result follows from the purpose of the statute. The tenant is allowed to withhold rent to in-duce the landlord to remedy the conditions rendering the premises uninhabitable. The landlord's incentive to repair comes from the knowledge that such action taken before trial will guarantee his full recovery of the withheld rent.

However, as we noted in *Appelstein* v. *Quinn,* 361 Mass. 861, these remedial statutes do not have any sub-stantive effect on the tenant's rental obligations under

situation, which could have demonstrated a constructive eviction, would now be sufficient proof of a material breach of the warranty of habitability, regardless of whether a sanitary code violation existed or not. On the other hand, there may be instances of isolated Code violations which may not warrant a decision that the premises are uninhabitable. The trial court must have the same broad discretion to determine whether there is a material breach given the special circumstances of each case as that accorded the board of health under Reg. 39 of the Code which allows the board to vary the application of any provision with respect to a particular case.

[17] Where one tenant gives the landlord notice of a defect which affects the habitability of other tenant's apartments, the other ten-ants may rely on the first tenant's notice.

[18] If the premises are uninhabitable at the beginning of the lease's term and the tenant decides to rescind the lease immediately, factors (c) and (d) should not be considered because the landlord is obligated to deliver the premises in a condition fit for immediate occupation.

the common law. Therefore, if the tenant's § 8A defence prevails, any withheld rent that had been paid into court must be returned to the tenant because the tenant's rental obligation depended on the landlord's warranty of habitability which has been broken. In these circumstances, the landlord's breach, since it goes to the essence of the contract, renders the lease voidable at the tenant's election.[19] If the tenant elects to stay on for the rest of the term and the landlord promptly cures his breach by remedying the defective conditions, the tenant's rental obligation for the remainder of the term will be revived when the dwelling becomes habitable. If the tenant elects to stay on until the end of the term and the landlord makes no repairs, the tenant will be liable for the reasonable value, if any, of his use of the premises for the time he remains in possession. See *Lemle* v. *Breeden*, 51 Hawaii 426; *Pines* v. *Perssion*, 14 Wis. 2d 590, 597.

(3) If the tenant fails to follow c. 239, § 8A's procedures, his refusal to pay some or all of the rent due will subject him to eviction proceedings to which he will have no defence. This result follows from the Legislature's sound policy judgment that the landlord needs the incentive of recovering the rent due him to promote prompt repairs. Thus, the tenant is faced with two alternative remedies with different consequences. If he is more concerned about getting his dwelling repaired than getting his rent abated or extinguished, he should follow the procedures established by c. 239, § 8A. If the tenant fails to follow these procedures, he cannot use the landlord's breach of the habitability warranty as a defence to a notice to quit for nonpayment of rent. However, though the landlord may, in that case, evict the tenant, the tenant may raise the landlord's breach of his warranty of habitability as a partial or complete defence to the landlord's claim for rent owed for the period when the dwelling was in uninhabitable condi-

---

[19] It is doubtful that a tenant at will, with a brief term between rent days, would utilize this remedy.

tion and the landlord or his agent had written or oral notice of the defects.[20] The tenant's claim or counterclaim for damages based on this breach would be the difference between the value of the dwelling as warranted (the rent agreed on may be evidence of this value) and the value of the dwelling as it exists in its defective condition.[21]

In the instant cases, the defendants failed to comply with the notice requirement of c. 239, § 8A. Therefore, we sustain the Superior Court judge's ruling that the tenants cannot raise the statute as a defence to the landlord's action of summary process.

However, the landlord's breach of its implied warranty of habitability constitutes a total or partial defence to the landlord's claim for rent being withheld, depending on the extent of the breach. The tenants' claim for damages based on this breach by the landlord should be limited to the period of time that each apartment remained uninhabitable after the landlord had notice of the defects. The measure of damages would be the difference between the value of each apartment as warranted and the rental value of each apartment in its defective condition.

The cases are remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

QUIRICO, J. (concurring in part and dissenting in part with whom Reardon and Wilkins, JJ., join). These

---

[20] The tenant may avoid the risk of eviction by paying his rent when due under protest and then sue the landlord to recover some or all of it because of the landlord's breach of his warranty.

[21] This remedy is quite similar to the one we afforded the tenant in *Charles E. Burt, Inc.* v. *Seven Grand Corp.* 340 Mass. 124, 130. "The appropriate measure of damage thus is the difference between the value of what Burt should have received and the fair value of what it has in fact received." See *Grennan* v. *Murray-Miller Co.* 244 Mass. 336, 339; *Daniels* v. *Cohen,* 249 Mass. 362, 364; *Parker* v. *Levin,* 285 Mass. 125, 128; Corbin, Contracts, §§ 1105, 1108, 1114, 1115; McCormick, Damages, § 142, p. 586; Williston, Contracts (3d ed.) §§ 1404, 1455, et seq. See also Am. Law of Property, §§ 3.51–3.52.

are two actions of summary process under G. L. c. 239 against tenants who admittedly had failed to pay their rent for dwelling units for a number of months.   In each action the landlord seeks to recover possession of the dwelling unit and also the unpaid rent.[1]

The tenants defend principally on the following grounds stated in each of their similar answers: "that prior to her refusal to pay rent, plaintiff was in violation of the State Sanitary Code including . . . [various conditions allegedly violating specifically cited regulations of the Code], that the Housing Inspection Department had inspected defendant's apartment . . . and found said apartment to be in violation of the State Sanitary Code and that the conditions . . . [which allegedly violated the Code] were such that 'said violations may endanger or materially impair the health or safety and the well being of any tenant therein . . .;' and that said violations and conditions . . . render the apartment uninhabitable and such conditions continue today." The tenants' allegations of specific violations of the Code were based on written inspection reports issued by appropriate housing inspectors describing those same conditions and concluding "that said violations may endanger or materially impair the health or safety, and the well-being of any tenant therein or persons occupying said property."

The answer of each tenant alleges that the landlord in these cases is "a public body organized and existing under the Housing Laws of Massachusetts which holds itself out to the public and its tenants as conforming to the law and specifically conforming to the State Sanitary Code . . . [and other cited statutes and regulations] requiring it to keep its premises in a safe and sanitary and habitable condition; and that the failure of [the] plaintiff herein . . . to lease and maintain the premises

---

[1] Ruth Briggs, the tenant in the companion case, vacated her apartment after trial of her case in the Superior Court.   Thus the only issue in her case is her liability for the unpaid rent.

in such condition is a breach of its implied warrantee [*sic*] of habitability to defendant and that defendant's obligation to pay rent is dependent upon plaintiff's performance of its Warrantee [*sic*] of Inhabitability and providing defendant with a home according to Code Standards, State and Federal Laws."

The answer of each tenant also "claims the protection of . . . [G. L. c. 239, § 8A, inserted by St. 1965, c. 888, as amended] which states that a defendant may not be evicted for non-payment of rent where the plaintiff is in violation of the State Sanitary Code and a proper inspection of said premises has been made and the tenant has been paid up in her rent prior to said inspection; [and] [t]hat the defendant has complied with . . . [c. 239, § 8A] and that therefore the plaintiff cannot recover." As to each tenant the trial judge found that she had failed to give the written notice required by § 8A, that she "would, because of such [Code] violations, withhold all rent thereafter becoming due until the conditions constituting such violations were remedied." He then properly ruled that § 8A "is not available to the defendant as a defense to this proceeding." See *Rubin* v. *Prescott*, 362 Mass. 281, 287–289.

Having thus failed to qualify for the defence which would otherwise have been available to them under § 8A, the tenants ask this court to give them relief by holding (a) that the landlord impliedly warranted the fitness of their apartments for habitation, (b) that the landlord violated the warranty, and (c) that the landlord's obligation to comply with the warranty and their obligation to pay their rent are mutually interdependent. Despite the tenants' use of the words "implied warranty of fitness" it is clear from their answers and requests for rulings, and from the entire record before us, that their defence and request for relief are based entirely on the existence of conditions which they contend constituted violations of the Code. I do not understand their position to be that the landlord owed them a duty to provide

or maintain for them apartments which exceeded, or included more than, that which is required by the minimum standards of the Code.

The situation before us is that tenants who have admittedly withheld payment of rent for apartments which they continued to occupy despite alleged violations of the Code now take the position that by reason of the violations the landlord may neither evict them nor recover any rent from them. The opinion of the court holds that the tenants are subject to eviction because of their failure to pay rent, but that their liability for unpaid rent is limited to the reasonable value, if any, of their apartments, considering the alleged violations of the Code. That holding is sufficient to dispose of the only issues raised in these cases, and to that extent I concur with the opinion.

However, the opinion of the court purports to declare a set of rules which go beyond the facts, issues and necessities of these cases. While I recognize that it is proper to discuss some of the far reaching implications and probable consequences of the holding, a clear line should be drawn betwen the holding and the additional discussion lest the latter be assumed, under the doctrine of stare decisis, to be a present commitment on questions not now being decided. *Swan* v. *Superior Court,* 222 Mass. 542, 545. *Erickson* v. *Ames,* 264 Mass. 436, 444. *Old Colony Trust Co.* v. *Commissioner of Corps. & Taxn.* 346 Mass. 667, 674–676. Additionally, I am unable to agree with some statements in the opinion which I think go beyond the holding necessary for the decision of these cases. Those statements from which I dissent will be discussed in a later portion of this opinion.

I agree with the majority of the court that, at least as to dwelling units, the time has come to reconsider the rule so long imbedded in our law of landlord and tenant that "[t]here is no implied agreement, apart from fraud, that the demised premises are or will continue to be fit for occupancy or safe and in good repair [and that] [t]he tenant takes the premises as he finds them and there is

no obligation on the landlord to make repairs." *Fiorntino* v. *Mason*, 233 Mass. 451, 452. *Foster* v. *Peyser*, 9 Cush. 242, 246–247. *Cowen* v. *Sunderland*, 145 Mass. 363, 364. *Kearines* v. *Cullen*, 183 Mass. 298, 300. *Walsh* v. *Schmidt*, 206 Mass. 405, 406. *Mills* v. *Swanton*, 222 Mass. 557, 559. *Conahan* v. *Fisher*, 233 Mass. 234, 237–238. *Bergeron* v. *Forest*, 233 Mass. 392, 398. *Borden* v. *Hirsh*, 249 Mass. 205, 210. *Bolieau* v. *Traiser*, 253 Mass. 346, 348. *Shepard* v. *Worcester County Inst. for Sav.* 304 Mass. 220, 221. *Hart* v. *Windsor*, 12 M. & W. 68.

The record of the past century reveals a striking contrast between the judiciary and the Legislature in their respective attitudes toward the need to insure to occupants of dwelling units a reasonable opportunity to obtain at least the minimum measure of shelter, safety (including protection from exposure to health hazards), facilities and services basic to the changing exigencies of a developing society. As early as 1871 the Legislature enacted a comprehensive set of regulations (St. 1871, c. 280) governing all types of buildings, particularly dwelling houses, tenements and lodging houses, in the city of Boston. In 1872 it enacted a statute (St. 1872, c. 243) which authorized other cities and towns to "prescribe rules and regulations for the inspection, materials, construction, alteration and safe use of buildings and structures." These were but the forerunners of a continuing series of statutes prescribing, or permitting municipalities to prescribe, detailed minimum physical standards and requirements for dwelling units and other buildings and providing criminal penalties for violations. Many of these statutes, in their amended form, ultimately became part of G. L. cc. 143, 144 and 145.

Since 1960 dwelling units have been subject to the State Sanitary Code adopted by the Massachusetts Department of Public Health under authority delegated to it by the Legislature (G. L. c. 111, § 5, later repealed, and § 127A). The Code, which has the force of law and applies throughout the Commonwealth, fixes mini-

mum standards of fitness of structures for human habitation. It does so in great detail and to an extent never before incorporated in any statute. It expressly provides that "[n]o person shall . . . let to another for occupancy any dwelling, dwelling unit, or rooming unit, for the purpose of living, sleeping, cooking, or eating therein, which does not comply" with its provisions, and further provides a criminal penalty for violation of its provisions. It expressly places the burden on the owner to comply with the prescribed minimum physical standards for rented dwelling units. The Code is not solely penal in nature. By G. L. c. 111, § 127C, as amended by St. 1969, c. 242, and § 127H, as amended by St. 1972, c. 201, a tenant may file a petition in the District or Superior Court to enforce compliance with the Code by the landlord; and by § 127K, inserted by St. 1968, c. 404, § 2, any agreement by the tenant to waive that right is declared to be against public policy and void. Both the enabling statute (G. L. c. 111, § 127A) and the Code (Art. I, Reg. 2.1) recognize the authority of municipalities to adopt local regulations containing requirements stricter than those contained in the Code. No such local regulations are involved in the cases before us.

A recent development indicating still further legislative authorization of regulation of buildings and structures, not limited to dwelling units, is found in G. L. c. 23B, §§ 16 through 23, inserted by St. 1972, c. 802, § 1, which has as an ultimate goal the adoption and enforcement of a uniform State building code which shall take effect throughout the Commonwealth on January 1, 1975. (St. 1972, c. 802, § 67.)

During the past century this court has continued to construe agreements for the rental of dwelling units according to historic and traditional common law concepts of property law, including the firmly imbedded rule of caveat emptor. It has continued to do so even in the face of statutes such as St. 1907, c. 550, § 127, applicable only in Boston, providing that: "Every structure and part thereof and appurtenant thereto shall be main-

tained in such repair as not to be dangerous. The owner shall be responsible for the maintenance of all buildings and structures. The lessee under a recorded lease shall be deemed the owner under the provisions of this act." In commenting on this statute in *Palmigiani* v. *D'Argenio*, 234 Mass. 434, 436, involving a tenancy at will, this court said: "It is plain that there is no express repeal of the rule at common law relating to contracts creating a tenancy at will, under which no liability is imposed on the landowner for obvious defects, or for want of repair, unless he contracts to keep the premises in a safe condition, and to make suitable repairs during the tenancy. . . . The statute not having attempted to regulate or modify the contractual relations of the parties it should not be broadened, or a construction adopted by implication which would materially limit the rights of parties to enter into such lawful contracts as they please. It would be going far to say that the Legislature intended to do away with fundamental law." Speaking of the same statute in *Vallen* v. *Cullen*, 238 Mass. 145, 147–148, the court said that it "does not in express terms attempt to modify or affect in any way the relations between landlord and tenant as they exist at common law." For other cases to the same effect and involving the same statute, though different sections thereof, see *Borden* v. *Hirsh*, 249 Mass. 205, 210, *Wynn* v. *Sullivan*, 294 Mass. 562, 566, and *Heilbronner* v. *Scahill*, 303 Mass. 336, 337–338. To the same effect, but involving other statutes, see *Garland* v. *Stetson*, 292 Mass. 95, 100–103, involving regulations on elevators under authority of G. L. c. 143, §§ 68–69, and *Richmond* v. *Warren Inst. for Sav.* 307 Mass. 483, 485, involving G. L. c. 143, § 23, prohibiting the obstruction of stairways.[2]

---

[2] Despite these repeated statements that such statutes are penal in nature and that they do not "modify or affect in any way the relations between landlord and tenant as they exist at common law," this court has nevertheless said in many cases, including most of those cited above, that in actions against the landlord for injuries sustained on the rented premises the violation of such a statute may, in certain circumstances, be evidence of the landlord's negligence.

The net result of this court's interpretation of these statutes was (a) that the owner of a dwelling unit which did not comply with the prescribed minimum standards could be prosecuted criminally, (b) that if he rented the unit without correcting the violations the statutes did not per se impose an obligation on him for the benefit of the tenant to correct the violations, and (c) that unless there was an express agreement to the contrary, the tenant took the unit subject to all existing violations and if he wanted them corrected the burden of doing so was on him. That result, when coupled with the operation of the further rule that even if the landlord expressly agreed to make repairs such an agreement was independent from the tenant's obligation to pay the rent, constitutes a formidable judicial roadblock preventing the tenant from having any practical means of obtaining the benefits which the statutes were designed and intended to give him.

The opinion of the court in the present cases does not discuss or otherwise deal with the rule quoted above from *Palmigiani* v. *D'Argenio*, 234 Mass. 434, 436. As the first step in the removal of the roadblock discussed above I would reverse that rule and hold instead (a) that the various statutes, ordinances, by-laws, rules, regulations and codes prescribing minimum standards for dwelling units impose on the landlord, for the benefit of his tenants, an obligation to comply with those minimum standards, and (b) that by renting such a unit the landlord impliedly agrees with his tentant (i) that at the time of the renting the unit complies with those standards and (ii) that during the term of the renting he will do whatever such legal provisions require him to do for compliance with such standards. Such a holding is necessary to insure that tenants shall enjoy the rights which these various legal provisions have created for their benefit. Other courts have made similar holdings.

The 1922 case of *Altz* v. *Leiberson*, 233 N. Y. 16, 18, involved a comprehensive statute, commonly called the

"Tenement House Law," which provided in part: "Every tenement house and all the parts thereof shall be kept in good repair." The plaintiff was injured by the falling of a ceiling in her apartment. The landlord argued that the statute had not changed the common law under which no duty rested on him to repair the rooms demised. In rejecting that argument, Judge Cardozo said at pp. 18–19: "The command of the statute, directed, as it plainly is, against the owner . . . has thus changed the ancient rule. . . . We may be sure that the framers of this statute, when regulating tenement life, had uppermost in thought the care of those who are unable to care for themselves. The legislature must have known that unless repairs in the rooms of the poor were made by the landlord, they would not be made by any one. The duty imposed became commensurate with the need. *The right to seek redress is not limited to the city or its officers*" (emphasis supplied). The same language was quoted with approval in *Javins* v. *First Natl. Realty Corp.* 428 F. 2d 1071, 1080–1081 (D. C. Cir.), where the court said further that the comprehensive set of housing regulations then in effect "creates privately enforceable duties," and that "by signing the lease the landlord has undertaken a continuing obligation to the tenant to maintain the premises in accordance with all applicable law." To the same effect see also *Whetzel* v. *Jess Fisher Management Co.* 282 F. 2d 943, 950 (D. C. Cir.), and *Kanelos* v. *Kettler*, 406 F. 2d 951, 953 (D. C. Cir.).

In the case of *Schiro* v. *W. E. Gould & Co.* 18 Ill. 2d 538, the defendants agreed in writing to erect a dwelling on a lot and then convey it to the plaintiff. The agreement was silent as to sewer and water connections. The city building code required the new house to be connected directly to the city sewer and water systems. The defendants connected it to the sewer and water installations of a house on the adjoining lot. The court said, at pp. 544–545: "It is settled law that all contracts for the purchase and sale of realty are presumed

to have been executed in the light of existing law, and
with reference to the applicable legal principles. . . .
Thus, the law existing at the time and place of the
making of the contract is deemed a part of the contract,
as though expressly referred to or incorporated in it.
. . . Consequently, the courts, in construing the exist-
ing law as part of the express contract, are not reading
into the contract provisions different from those ex-
pressed and intended by the parties . . . but are merely
construing the contract in accordance with the intent of
the parties. . . . Applying this established law to the
instant case, it is evident that the contract . . . in-
cluded, as an integral part, the relevant provisions of the
city code in existence at the time the contract was exe-
cuted. The requirements of that code were, therefore, as
much a part of the contract as if they had been enu-
merated by the parties."

The above statement was quoted with approval in
*Jack Spring, Inc.* v. *Little,* 50 Ill. 2d 351, 361–362,
where the court held that in the rental of certain dwell-
ings the landlord impliedly warrants that the premises
comply with the city's building code. A dissenting opin-
ion in the *Jack Spring* case contains the following ob-
servations, at pp. 374–375 : "The housing code of the city
of Chicago . . . imposes certain obligations upon an
owner of dwelling units to repair and maintain the same.
In keeping with this expression of legislative intent I
would imply in every lease covering residential property
within the purview of the housing code . . . an implied
covenant by the lessor to repair the premises in keeping
with the requirements of the housing code. . . . Possibly
my preference for the use of the term 'implied covenant'
instead of 'implied warranty of habitability' as used by
the majority is only a matter of semantics. However,
I prefer the covenant designation because it definitely
indicates an obligation or an undertaking by the lessor
as part of the lease itself. The term 'warranty,' how-
ever, generally carries with it the idea of a holding out
or a representation thereby inducing another to act.

(8 Williston on Contracts, 3d ed. (Jaeger), sec. 970.) Although the concept of a representation or an inducement may be appropriate in cases where the lessee has been justified in abandoning the premises because of its original condition, as in *Lemle* [*Lemle* v. *Breeden,* 51 Hawaii 426] and *Pines* [*Pines* v. *Perssion,* 14 Wis. 2d 590], to apply the term to a simple situation concerning repairs seems to be needlessly indulging in what may possibly be a confusing fiction."

The second step required for the removal of the roadblock is the reversal of the present common law rule that the obligation of the tenant to pay rent and the obligation, if any, of the landlord to repair or maintain the rented premises are independent, and the substitution therefor of a new rule that such obligations are substantially mutually interdependent. The opinion of the court accomplishes this. However, the second step without the first will apply only to those very few cases in which the landlord has expressly agreed to repair or maintain the rented premises, and it will not benefit the present tenants, and the many others similarly situated, whose landlords have not expressly agreed to do so and against whom the present law implies no obligation to do so. The present tenants and others similarly situated can benefit only if this court also takes the first step described above, thereby reversing the present common law rule that "[t]here is no implied agreement, apart from fraud, that the demised premises are or will continue to be fit for occupancy or safe and in good repair [and] the tenant takes the premises as he finds them and there is no obligation on the landlord to make repairs." *Fiorntino* v. *Mason,* 233 Mass. 451, 452.

The point at which I dissent from the opinion of the court is where it attempts to accomplish the first step by resort to an implied warranty of the fitness of the rented dwelling unit instead of by the implication of an agreement that the unit will comply with the minimum standards required therefor by law. The court states the new rule to be that the landlord renting a dwelling

unit impliedly warrants to the tenant "that the premises are fit for human occupation . . . [which] '. . . means that at the inception of the rental there are no latent [or patent] defects in facilities vital to the use of the premises for residential purposes and that these essential facilities will remain during the entire term in a condition which makes the property livable.' " The court makes no attempt to define what is required to make a dwelling unit "fit for human occupation," or to make "the property livable," or to define what may constitute a material breach of the new implied warranty. It suggests that broad discretion be left to trial courts to decide these questions on a continuing case by case basis.

I dissent from the statement of such a broad and sweeping new rule for the reason, in part, that it would be sufficient for the decision of these cases to hold that the landlord, in renting the apartments to the tenants, impliedly agreed that the apartments would comply with the several requirements of the Code which the tenants allege were violated, and that if the tenants sustain their burden of proof of such violations their liability for the unpaid rent may be reduced to the fair value of their use and occupancy of the apartments in their deficient condition.

I dissent from the stated new rule for the further reason that the basis and scope of the landlord's obligation thereunder are related to the court's implication of a new and otherwise undefined warranty of fitness of the rented premises for human habitation. The present situation in this Commonwealth is not one of a void in the law with reference to what is required of dwelling units to constitute "fitness for human habitation" (G. L. c. 111, § 127A). As already noted in this opinion, we have had considerable legislative and administrative attention and action on this subject. We have the numerous statutes passed by the Legislature. Municipalities have been authorized to enact ordinances or by-laws and to adopt rules and regulations thereon.

The Department of Public Health, by authority expressly delegated to it by the Legislature, has adopted the State Sanitary Code having the force and effect of law throughout the State. In short, the field has been occupied, and the void, if any, has been filled. It remains for the courts only to accommodate their rules of common law to enable tenants to enforce against landlords these mandatory, detailed, precise and easily understandable minimum standards of fitness of dwelling units for human occupation, rather than to create a new implied and undefined obligation which will require years of litigation to develop and define.

Since it is clear that mandatory minimum standards for housing units as prescribed by statutes, ordinances, rules, regulations or codes having the force and effect of law cannot be waived or otherwise undercut by agreement of the parties to a tenancy, it appears that the opinion contemplates that the new implied warranty may require even higher standards to satisfy its requirement of fitness "for human occupation." Thus these identical words would have one meaning under applicable statutes, ordinances, rules, regulations or codes, and they might have a different meaning under the proposed implied warranty. The court's opinion itself says, in footnote 16, that "the protection afforded by the implied warranty of habitability does not necessarily coincide with the Code's requirements." This deliberate creation of a presently undefined, indeterminable and uncharted area of potential rights and liabilities of landlords and tenants can serve only to vex them and to produce litigation otherwise avoidable.

In the past dozen years we have witnessed a growing number of decisions and other legal writings which seemingly compete in their use of rhetoric and eloquence to inveigh against the "old common law" rules relating to landlords and tenants and argue that the rules which were developed for use in a "rural agrarian society" now serve only to victimize and shackle the apartment dwellers of our modern "urban industrial society." They

make frequent use of the words "implied warranty of habitability" and in most instances they make no attempt to explain or define what is included in such a warranty. In its present opinion the court seems to rely considerably on these decisions and writings, and the opinion quotes from some of them at length. Although some of the decisions on which the court seems to place its greatest reliance include in their discussions general language about the implication of a warranty of habitability, it is clear from the express language of their holdings that they imply a warranty of habitability which is limited to the minimum standards prescribed by applicable statutes, ordinances, by-laws, codes, rules and regulations.

The opinion of the court appears to rely principally on the decision in *Javins* v. *First Natl. Realty Corp.* 428 F. 2d 1071 (D. C. Cir.), and it quotes at length from what I believe to be dictum in that case. The facts of that case were very much like those of the present cases. The holding of that case is stated near the beginning of the opinion at pp. 1072–1073 to be that *"We . . . hold that a warranty of habitability, measured by the standards set out in the Housing Regulations* for the District of Columbia, *is implied by operation of law* into leases of urban dwelling units covered by those Regulations and that breach of this warranty gives rise to the usual remedies for breach of contract" (emphasis supplied), and the holding is repeated near the end of the opinion at p. 1082 in the following language: *"We therefore hold that the Housing Regulations imply a warranty of habitability, measured by the standards which they set out,* into leases of all housing that they cover" (emphasis supplied).

The opinion of the court also cites the 1972 case of *Jack Spring, Inc.* v. *Little,* 50 Ill. 2d 351, as standing for the rejection of the common law rule and for implying a warranty of habitability. However, the holding in that case at p. 366 was: "We find the reasoning in *Javins* persuasive and we hold that included in the contracts,

both oral and written, governing the tenancies of the defendants in the multiple unit dwellings occupied by them, is *an implied warranty of habitability which is fulfilled by substantial compliance with the pertinent provisions of the Chicago building code"* (emphasis supplied). In the later case of *Gillette* v. *Anderson,* 4 Ill. App. 3d 838, 841–842, the court in applying the rule of the *Jack Spring* case said: "[T]he oral lease . . . included an implied warranty of habitability and *the standards of that warranty would be those standards set forth in those sections of the ordinances of Waukegan related to housing"* (emphasis supplied).

The case of *Hinson* v. *Delis,* 26 Cal. App. 3d 62, 71, cited in the court's opinion, holds only that a tenant proving that the dwelling unit which she occupied was in violation of the applicable code was entitled to a declaration that she "is obliged to make rental payments only after the defendant [landlord] complies with his duty to substantially obey the housing codes and make the premises habitable."

In the 1972 case of *Mease* v. *Fox,* 200 N. W. 2d 791, 796 (Iowa), the court said that "the implied warranty we perceive in the lease situation is a representation there neither is nor shall be during the term a violation of applicable housing law, ordinance or regulation which shall render the premises unsafe, or unsanitary and unfit for living therein."

The opinion of the court also cites and quotes from the decisions in *Pines* v. *Perssion,* 14 Wis. 2d 590, and *Kline* v. *Burns,* 111 N. H. 87. Although the court in each of these cases said it was implying a warranty of habitability of the dwelling unit in question, it should be noted that in each case the facts held to constitute a breach of the warranty consisted of violations of the building or housing codes. The relationship between the court's decision in the *Pines* case and legislative and administrative housing standards is obvious from the following language at pp. 595–596 of the decision: "Legislation and administrative rules, such as the safe-place statute,

building codes, and health regulations, all impose certain duties on a property owner with respect to the condition of his premises. Thus, the legislature has made a policy judgment — that it is socially (and politically) desirable to impose these duties on a property owner — which has rendered the old common-law rule obsolete. To follow the old rule of no implied warranty of habitability in leases would, in our opinion, be inconsistent with the current legislative policy concerning housing standards." For other cases to the same effect, see *Marini* v. *Ireland,* 56 N. J. 130, and *Lund* v. *MacArthur,* 51 Hawaii 473. All four of these cases could have been decided in favor of the tenants on the basis of the landlord's violation of applicable building or housing codes, as could the cases now before us, without imposing a broader warranty. See Schoshinski, Remedies of the Indigent Tenant: Proposal for Change, 54 Georgetown L. J. 519, 523, for discussion of "Implied Warranty of Habitability Based on Housing Regulations."

If it were now necessary or appropriate to indicate by dictum what the ultimate scope of our new rule might be, beyond the necessities of the present cases, I would state it to be (a) that by renting a dwelling unit a landlord impliedly agrees, with respect to the minimum standards prescribed by any applicable laws, regulations or codes (such as the State Sanitary Code) having the force and effect of law, (i) that the rented unit complies with such standards at the time of the renting, and (ii) that he will do whatever such laws, regulations or codes require a landlord to do for compliance with such standards during the term of the renting, (b) that the landlord's obligation to provide and maintain premises which comply with those minimum standards and the tenant's obligation to pay the agreed rent are substantially mutually interdependent, (c) that if the tenant shall fail to pay the agreed rent when due the landlord may evict him notwithstanding the tenant's claim or allegation that the landlord has failed to comply with the prescribed

minimum standards,[3] and (d) that if the landlord fails in any material respect to comply with the prescribed minimum standards the tenant may (i) elect to remain in possession, paying the full amount of the agreed rent under protest based on such violation, and then bring an action to recover the excess of the amount paid over and above the fair value of the occupancy of the deficient premises, or (ii) vacate the premises, thereby terminating the tenancy, and as to rent unpaid for any period of occupancy the landlord may recover the fair value of such occupancy of the deficient premises. If such a rule were adopted, it would, of course, require further attention to such matters as notice to the landlord of Code violations arising after the letting, the time permitted the landlord to correct the violations, and the nature, extent or duration of a violation necessary to entitle the tenant to vacate or exercise other remedies available to him by reason of the violation.

Admittedly the rule suggested above does not cover the situation constituting a "constructive eviction" of a tenant which is discussed in the court's opinion, but that is because the facts of the present cases do not involve such a situation. There is nothing to suggest that our courts which have heretofore given relief to a tenant who is the victim of a "constructive eviction" will not continue to do so in an appropriate case. Historically the orderly development and evolution of the common law has been accomplished primarily by the judicial decision of issues

---

[3] This obvious limitation on the total interdependence of the landlord's obligation to repair and maintain the rented premises and the tenant's obligaton to pay rent also appears in the opinion of the court. It is a reasonable limitation in view of the fact that a tenant, if he wishes to remain in possession and either withhold payment of rent or pay rent into court, may do so to the extent permitted by G. L. c. 111, § 127F, inserted by St. 1965, c. 898, § 3, § 127H, as amended by St. 1972, c. 201, and § 127L, inserted by St. 1972, c. 799; or by G. L. c. 239, § 8A, as amended by St. 1969, c. 355. As a matter of policy it is not desirable that a tenant who does not avail himself of these statutory remedies be permitted to continue to occupy the landlord's premises indefinitely, without paying the rent to the landlord or depositing it in court when due, while prolonged legal proceedings to establish the rights and liabilities of the parties await final disposition by the courts.

actually in controversy, with due consideration for the consequences of the decision, but without trying to anticipate and simultaneously decide all possible related questions which might arise later.